UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MEDLINE INDUSTRIES, INC., | ) |
| | ) |
| Plaintiff, | ) Case No. 16-cv-3529 |
| | ) |
| v. | ) Judge Sharon Johnson Coleman |
| | ) |
| C.R. BARD, INC., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Medline Industries, Inc. ("Medline"), brought this action alleging that defendant C.R. Bard, Inc. ("Bard"), infringed on United States patents number 9,283,352 ("the '352 patent"), 8,746,452 ("the '452 patent"), and 9,522,753 ("the '753 patent"), all of which concern Medline's design for urinary catheter trays. Bard sells a competing catheter tray, which Medline alleges infringes on the design of its own product. This case is now before the Court for claim construction. The parties having submitted written briefs and supporting evidence, and this Court having held a two-day claim construction hearing, the Court construes the disputed claim terms as follows.

**Legal Standard**

Patent claims define the scope of the patentee's exclusive right to an invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). The construction of those claims, when their meaning is disputed, is a legal question that must be resolved by the Court before trial. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The court construes the claims to give meaning to the limitations contained in the patent based on the claim language, the patent specification, the prosecution history, and any relevant extrinsic evidence. In

1

construing the claims, courts must be careful not to redefine claim recitations or read limitations into the claims in order to avoid potential issues on the merits. *Id.*

**Discussion**

*A First Compartment Base Member Having At Least One Inclined, Stair-Stepped Contour*

The parties dispute the meaning of Claim 1 of the '452 patent, which describes "a first compartment base member having at least one inclined, stair-stepped contour." Within that claim, the parties first contest the meaning of "first compartment base member." Bard, relying on its proposed definition of "base," asserts the commonsense position that the "base member" is the bottom surface of each compartment.[1] Medline, by contrast, seeks to define "base member" as a support structure for the devices stored in the tray.

The '452 patent's specification describes the base members as follows:

> In one embodiment, the compartments are open from the top of the tray 100—the top being opposite the base members of the tray 100—and are bounded on the bottom by a first base member 107, a second base member 108, and a third base member 109.

This description is reflected in claims 11, 12, and 13, which describe:

> 11. The tray of Claim 1, wherein the first opening is bounded by a first opening base member and two inclined first opening side members.
> 12. The tray of claim 11, wherein the second opening is bounded by a second opening base member, an inclined second opening side member, and the perimeter wall.
> 13. The tray of claim 1, wherein each of the first compartment, the second compartment, and the third compartment are open along a side of the tray opposite the second base member.

---

[1] Medline appears to contend that "bottom" describes only the lowest portion of a given surface, and that describing the "base member" as the "bottom" of the compartment would therefore exclude the inclined, stair-stepped portion of the first compartment. The Court does not believe that the common meaning of "bottom," in the context of the claim here, justifies that concern or has any potential to confuse the jury as to what is entailed.

2

The claim and specification thus establish that the "base member" constitutes the bottom surface of each compartment. Medline, in support of its construction, relies on language from claim 15 providing that "the first compartment base member" be "configured to support each of the plurality of syringes at different depths within the tray relative to the depth of the second compartment base member." The fact that the base member is described as being arranged to support other items, however, does not establish that it should be construed primarily as a support structure for the devices in the tray. That function is secondary to the base member's primary characterization as being the bottom of the tray. Bard's construction is therefore more consistent with both the relevant claims and a person of skill in the art's understanding of the term base member. The Court accordingly construes "base member" to mean "the base of each compartment."

Bard briefly disputes the construction of the term "inclined," as that term is used in the disputed claim language. Bard proposes, without explanation or justification, that "inclined" should be construed as "slanted." Inclined, however, has a clear definition and is, in this Court's estimation, in fact a clearer expression of what is claimed than slanted. In any event, construction is unnecessary where, as here, the parties merely dispute which synonym to use in construing a given claim term. *See Roll-Rite, LLC v. Shur-Co, LLC,* No. 12-11150, 2013 WL 3798101, at *4 (E.D. Mich. 2013) (quoting Peter Menell et al., *Patent Case Management Judicial Guide* § 5.1.4.3 (Fed. Jud. Ctr. 2009)) (recognizing that the Court need not function as a thesaurus in construing plain English terms); *see also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (noting that claim construction "is not an obligatory exercise in redundancy"). The Court accordingly declines to construe "inclined" and turns to the parties' conflicting interpretations of "stair-stepped."

Bard proposes that "stair-stepped" be construed to mean that adjacent portions of a surface are positioned progressively according to height. This interpretation plainly comports with the appearance of stairs, which is the presumptive root of the term "stair-stepped." *See Stair-step*,

3

Oxford English Dictionary (recognizing "stair-step" as describing something resembling stair-steps). Medline, by contrast, suggests that "stair-stepped" simply means that there are two or more surfaces at different heights, with no requirement that they be adjacent. This interpretation is not tenable, as the existence of a third intervening surface of a different height destroys the stair-like appearance of the surfaces in question. Under Medline's proposed interpretation, any two similarly oriented surfaces in its tray could be described as being "stair-stepped."

Bard's interpretation of "stair-stepped" also derives support from the prosecution history of the '452 patent. Medline characterized the stair-stepped contours to the patent examiner as "platforms upon which one can change elevation by traversing from one to the next," a description which implicitly suggests adjacency. Although given minimal weight, Maze's testimony as the inventor of the product and the diagrams depicting the preferred embodiment also lend support to this interpretation. Accordingly, this court construes stair-stepped as describing two adjacent surfaces with different heights.

The Court therefore turns to the construction of the consolidated phrase "a first compartment base member having at least one inclined, stair-stepped contour." Medline advances the construction that the base of the first compartment "has at least one incline and has surfaces at different heights." This construction is contrary to the plain language of the claim, which contemplates at least one "inclined, stair-stepped contour." Pursuant to that language, the contour in question must both be inclined and stair-stepped, which is contrary to Medline's proposed construction requiring at least one incline and at least one stair-step. Bard's proposed construction, however, is similarly flawed. Bard's proposed construction is that "the bottom surface of the first compartment is slanted and adjacent portions of the bottom surface are provided at different heights." The claim, however, contains nothing requiring that the entire bottom surface be slanted.

Based on this Court's prior construction of the specific claim components, the court construes this claim language as describing that "the bottom surface of the first compartment contains at least one portion which is both inclined and stair-stepped."

*Mneumonic Device / Mnemonic Reminder*

The parties next dispute the construction of the terms "mnemonic device" and "mnemonic reminder" as that term is used in the '753 and '352 patents. The '352 patent claims"[t]he catheterization procedure system of claim 1, the contoured surface defining a mnemonic device indicating which of the first syringe or the second syringe should be used first in the catheterization procedure." It further claims "the catheterization procedure system of claim 14, the first compartment defining a mnemonic reminder to use a higher syringe disposed within the first compartment before a lower syringe disposed within the first compartment." The '753 patent similarly claims a method of packaging a medical procedure kit comprising "placing the coiled medical device, the first syringe, and the second syringe within the single level tray, the placing comprising placing the first syringe in a first compartment defining a mnemonic device indicating which of the first syringe or the second syringe should be used first in a catheterization procedure."

Medline proposes that mnemonic device or mnemonic reminder be defined as a "feature intended to assist the memory." Bard, by contrast, proposes that this term be more narrowly construed as "a first compartment supporting the syringes at different heights and locations to provide a cue as to their order of use." There can be no practical dispute that, by its commonly understood meaning, a mnemonic device constitutes a device which aids in remembering something. The specifications for both the '753 and '352 patents provide that

> The stair-stepped contour 115 can be used as mnemonic device when multiple syringes are stored within the first compartment 101. For example, it may be intuitive that a syringe placed on a higher step portion may need to be used first. This intuition is further enforced when the higher step portion is disposed farther to the left in a left-to-right usage configuration. Thus, a user receives a mnemonic

> reminder to use a syringe disposed on the first step portion 116 prior
> to a syringe disposed on the second step portion 117, as it is both
> higher and farther to the left.

Bard asserts that these specifications describe the mnemonic device or reminder as having an elevation and location component. It is well established, however, that patent claims should not be construed as being limited to their preferred embodiments. *Phillips v. AWH Corp.*, 315 F.3d 1303, 1323 (Fed. Cir. 2005). An individual of ordinary skill in the art, upon being informed that the first compartment constitutes a mnemonic device, would understand that the first compartment contained features to aid memory, not that it contained a specific slope or a step as Bard contends.

Bard's arguments based on the prosecution history of these patents is similarly unavailing. During the prosecution of the '753 patent, Medline represented to the patent examiner that prior art did not teach a mnemonic indicating which syringe should be used first because all of the syringes in the prior art were "disposed at the same height, in the same manner." Bard asserts that this argument established that the "mnemonic device" required that the claimed tray support syringes at a different height. What Medline was actually arguing, however, is that the prior art lacked a mnemonic device because it contained *no* feature designed to assist the memory.

The patent examiner's interpretation of "mnemonic device," far from supporting Bard's theory, lends credence to the construction this Court adopts. The examiner observed that:

> The term "mnemonic device" is not specially defined in the
> specification, and is therefore given its common meaning. Bower,
> Gordon H. (1970) provides a background of mnemonic devices,
> which include (1) a known list of "cues" and (4) associations made in
> one-to-one pairings (p. 500, Componential analysis of the
> mnemonic). In the context of the claimed catheter tray, the cues are
> provided by chambers of different heights and locations, and the
> pairings are provided as a specific order of using syringes.

Thus, the examiner both defined mnemonic device and, subsequently, explained how a mnemonic device was manifested in the claimed invention through the claimed features of the first compartment.

6

In light of the intrinsic evidence, there is no need for this Court to expressly construe "mnemonic device" as describing "a first compartment supporting the syringes at different heights and locations to provide a cue as to their order of use," and doing so would render the claim language redundant. *See Ross-Hime Designs, Inc. v. United States*, 126 Fed. Cl. 299, 317 (Fed. Cl. 2016) (rejecting a proposed construction that would render claim language redundant). An individual of ordinary skill of the art, in interpreting the disputed claim language, would interpret "mnemonic device" or "mnemonic reminder" to have their common meaning of "feature intended to assist the memory."

*Lubrication Jelly Application Compartment / Lubrication Channel*

The parties next dispute the construction of claim language concerning the lubrication jelly application channel. The '352 patent claims "the first compartment defines a lubricating jelly application compartment to receive lubricating jelly from one of the first syringe or the second syringe to lubricate the catheter when the catheter is passed from the second compartment into the first compartment." It further claims "the first compartment defining a lubrication channel bounded by a first compartment base member, the wall, and a perimeter wall, wherein the perimeter wall terminates at a horizontal flange." The '753 patent similarly claims "[t]he method of claim 11, the first compartment defining a lubricating jelly application chamber, further comprising lubricating at least a portion of the Foley Catheter in the lubricating jelly application chamber."

Medline construes the terms "lubrication jelly application compartment," "lubrication jelly application chamber," and "lubrication channel" as describing "a compartment or channel where lubrication is applied." By contrast, Bard asks this Court to construe those terms as meaning that "the portion of the base member of the first compartment where the lubricating jelly is dispensed is lower than adjacent portions of the base member."

7

Bard's proposed definition adds a limitation not contained in the intrinsic record by requiring that the compartment in question must be lower than adjacent portions of the base member. The claim language, however, only specifies that the first compartment creates a lubrication application chamber, not that the lubrication chamber is formed by a component of that compartment. The specification language similarly describes the first compartment as being used to apply lubricating jelly. Based on this language, a person of ordinary skill in the art would interpret "lubrication channel" or "lubrication compartment" as describing a compartment or channel in which lubrication is applied.

Bard's argument to the contrary is based entirely on the preferred embodiment, which is reflected in specification language noting that the second step of the stair-stepped contour lends itself to lubricant application because it is the lowest portion of the first compartment. Limitations described by a patent's chosen embodiment, however, cannot be read into the construction of the patent's claims because they constitute just one possible embodiment of the patent. *Hill-Rom Services, Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). Bard, moreover, has not demonstrated alternative grounds such as lexicography or disavowal that would permit this Court to further narrow its construction beyond the meaning that a person of ordinary skill in the art would give to the claim language as written. Accordingly, this Court declines to deviate from the plain and obvious meaning of "the terms "lubrication jelly application compartment" or "lubrication jelly application channel" as "a compartment or channel where lubricant is applied."

*Substantially Coplanar*

The '452 patent claims, in part, "[t]he tray of Claim 1, wherein the second base member and third base member are substantially coplanar." Bard requests that this Court construe "substantially coplanar" as "lying largely on the same plane." Medline, in turn, requests that this Court construe the term as meaning "on or near the same plane."

8

This Court is not the first court called upon to construe such language. There is no dispute that coplanar means "lying or acting in the same plane," a definition which has been adopted by other courts. *Siliconix Inc. v. Denso Corp.*, Nos. C 05-01507 WHA, C 04-00344 WHA, C 05-03617 WHA, 2006 WL 6131028 at *4 (N.D. Cal. 2006). The parties also do not appear to dispute the Federal Circuit's previous interpretation of "substantially" as meaning "largely but not wholly that which is specified." *Id.* (citing *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1354 (Fed. Cir. 2001)). That definition, however, does not entirely resolve the question here, which is whether "substantially coplanar" means "on or near the same plane" or "largely on the same plane."

The parties point to no other claim language to assist in resolving this dispute, and this Court therefore turns its attention to the specifications. The patent specifications here reiterate that the second and third base member are substantially coplanar, and further explain that in the accompanying figures:

> the second compartment base member 108 and third compartment base member 109 are generally flat . . . although it will be clear to those of ordinary skill in the art having the benefit of this disclosure that contours could be incorporated into one or both of these base members.

This specification language clearly suggests that the second and third base members, although flat, might have contours that would render them not entirely coplanar. This lends strong support to Bard's proposed construction of "lying largely on the same plane" because the contours in question would not be on the same plane as the majority of the base members.

Conversely, subsequent specification language provides that "[i]n this illustrative embodiment, however, the first compartment base member 107 is configured to be inclined relative to one or both of the second compartment base member 108 and third compartment base member 109." The use of "one or both" in this passage suggests that the second and third base member

9

need not be parallel, supporting the inference that "substantially coplanar" might indicate "on nearly the same plane."

The specification language thus lends credence to both parties proposed constructions. Neither Medline nor Bard can establish, through intrinsic evidence, that the claim at issue was meant to exclude the other party's proposed construction. Accordingly, rather than arbitrarily narrowing the potential construction of "substantially coplanar," the Court will construe it broadly to encompass both parties' proposed definitions by interpreting it to mean "lying largely on, or nearly on, the same plane."

*The Perimeter Wall Terminates at the Horizontal Flange*

The '352 patent claims a tray design wherein "the perimeter wall terminates at a horizontal flange." Bard proposes that this phrase be construed to mean "the wall that encloses each side of the tray forms a corner with a projecting flat rim that extends along the edge of the tray." Medline, in turn, proposes that it means that "the wall along the perimeter of the tray ends at a projecting flat rim, collar, or rib."

The Court first turns to the construction of "the perimeter wall." Bard asks this Court to construe this term as "a wall that encloses each side of the tray" based on claim language describing the various compartments as bounded by the perimeter wall. Medline, by contrast, contends that the meaning of "perimeter wall" is clear and requires no additional construction. Alternatively, Medline proposes that the term means "a wall along the perimeter of the tray." The Court agrees with Medline that the meaning of "perimeter wall" is plain and obvious. The parties' proposed constructions, moreover, are themselves virtually indistinguishable, and therefore unlikely to provide any additional clarity to a finder of fact. In light of "perimeter wall's" plain and ordinary meaning and the parties' failure to present a substantial dispute as to the construction of that term, the Court declines to construe it. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)

(recognizing that claim construction is not an "obligatory exercise in redundancy"); *see also Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (holding that claim terms should be given their ordinary meaning absent a conflicting definition or disavowal).

Notwithstanding initial disagreement, the parties now appear to agree that "horizontal flange" should be construed as "a projecting flat rim."[2] The parties disagree, however, about how the transition between the perimeter wall and the aforementioned rim should be construed. Bard contends that the perimeter wall "forms a corner" with the projecting flat rim, while Medline contends that the perimeter wall "ends" at the projecting flat rim because the claim does not require a corner. Both parties rely on testimony from Jack Maze, the co-inventor of the '352 patent, who at various times has stated both that the perimeter wall terminates at the horizontal flange and at a corner before transitioning to the horizontal flange. Medline asserts that the requirement of a "corner" is not contained in the patent or specifications, and that alternative transitions such as a "rounded edge" could be used.

The Court agrees with Medline that interjecting the term "corner," which is not expressly supported by intrinsic evidence, will raise additional and avoidable questions regarding the meaning of that claim, such as where precisely this "corner" begins or ends or what degree of curvature is necessary to constitute a corner. The claim here provides that a vertical wall will end at a horizontal surface. A person of ordinary skill in the art, and for that matter an ordinary person, would already interpret this transition as requiring a corner, curve, or other form of transition between those two planes. The Court sees, and the record provides, no reason to expressly construe the claim language to require a corner or to define the perimeter wall as ending at the start of such a corner.

---

[2] Bard has proposed that the horizontal flange be described as a "projecting flat rim" from the outset. Medline, at the Markman hearing, agreed to construing the horizontal flange as such, although noting concern that "rim" would imply a narrower form than "flange."

11

The Court therefore construes the '352 patent's claim that "the perimeter wall terminates at a horizontal flange" as meaning that "the perimeter wall ends at a horizontal rim."

*Instruction Manual*

The '352 patent claims that the catheterization procedure set forth in the first claim further comprises "an instruction manual." The parties dispute both how this claim should be construed and whether it was even patentable in the first instance.

The Federal Circuit has long held that a limitation claiming (a) printed matter that (b) is not functionally or structurally related to the physical substrate holding the printed matter does not lend any patentable weight to a patentability analysis. *In re Distefano*, 808 F.3d 845, 848 (Fed. Cir. 2015). Under this authority, Bard asserts that Medline's claim of an "instruction manual" is invalid. Bard, however, has offered no legal authority establishing that claim validity is properly determined during claim construction. To the contrary, the Federal Circuit has seemingly recognized that validity analysis at this juncture would be premature. *See Rhine v. Casio, Inc.*, 183 F.3d 1342, 1346 (Fed. Cir. 1999) (recognizing that a defendant "cannot avoid a full-blown validity analysis by raising the specter of invalidity during the claim construction phase.").

Turning to the construction of "instruction manual," Bard proposes to construe the term as describing "instructions regarding the use or operation of a product." Medline, in turn, proposes that this claim be construed as "a booklet of instructions regarding catheterization." Notwithstanding its own failure to incorporate "manual" into its construction, Bard contends that Medline's proposed construction is insufficient because the "manual" need not be a "booklet." This argument is supported by the specification, which describes one embodiment of the instructions as having an "accordion-style" fold rather than being bound in the manner of a book or booklet. Accordingly, in light of the claim language and specification, the Court concludes that "instruction manual" cannot be construed narrowly as describing only instructions presented in booklet form.

12

Bard contends that Medline's proposed construction is insufficient because the specification clearly establishes that the instructions will concern more than just catheterization. Pursuant to the specifications, the instruction manual at issue can teach how to set up a sterile work environment, how to prepare the catheter assembly, how to use the other devices in the tray, how to insert the catheter, how to secure the drainage bag to the catheter, how to empty the drainage bag, and how to obtain a urine sample. The specification further provides that the patient-focused portion of the instructions can include suggestions or instructions for the patient such as what a catheter is, what the patient should know about the catheter, how to reduce the risk of infection, information about infections associated with catheters, and suggestions for home use. Although all of these subjects are related to catheterization, the Court does not believe that Medline's construction of the manual as "regarding catheterization" is necessary or warranted when, as here, "catheterization" constitutes only one component of the process the claimed invention concerns. Medline, in turn, asserts that not all of the instructions are about the use or operation of a product as Bard's proposed construction claims. The information identified in the specification, however, is information about the use and potential complications of the product contained in Medline's tray. The Court, referencing the claim specification, therefore construes the claimed "instruction manual" as "printed instructions regarding the use or operation of a product."

*Catheter Assembly*

The final term that the parties ask this Court to construe is "catheter assembly." Claim 1 of the '452 patent claims "[a] tray configured to accommodate a catheter assembly and medical devices corresponding to catheter use." Bard, adopting a broader construction, contends that "catheter assembly" should be construed as "a medical device that includes a catheter connected via tubing to a drainage receptacle." Medline, by contrast, contends that it should be construed as "a medical device that includes a Foley catheter connected via coiled tubing to a drainage receptacle."

13

It is a well-established principle of patent construction that general descriptive terms ordinarily receive their full meaning and that modifiers will not be added to broad terms standing alone. *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). Here, the claim language describes a "catheter assembly," but contains nothing to suggest that the term "catheter assembly" describes a particular type of catheter or that the meaning of the term "catheter" was unclear. Accordingly, the Court sees no reason to reference extrinsic or intrinsic evidence to modify or narrow the scope of that term. *Id.*

Even if reference to such evidence was necessary, moreover, Medline has failed to establish that extrinsic and intrinsic evidence support the interpretation that it seeks. Notwithstanding the lack of intrinsic evidence expressly establishing that the "catheter assembly" describes a Foley Catheter, Medline asserts that an individual or ordinary skill in the art would recognize the catheter assembly to contain a Foley catheter based on the collective information provided in the patent claims and patent specification. Both the patent claims and patent specifications contemplate the ability to accommodate multiple syringes and the need to lubricate the catheter assembly. Although the evidence before this Court establishes that Foley catheters require multiple syringes and lubrication, it does not conclusively establish that these needs are exclusive to Foley catheters. The '452 patent, moreover, does not unequivocally require multiple syringes. The specification expressly states that the two syringes are for illustration purposes only and can be omitted, and the patent's claims only require that there be "at least one syringe." Medline also points to the patent background's observation that catheters are available in a variety of lengths ranging from 100 centimeters to over 250 centimeters. Although Medline contends that this length would aptly characterize a Foley catheter assembly, Medline also concedes that a Foley catheter, absent additional components such as a drainage tube, is nowhere near this long. If this length requirement describes an entire catheter assembly, this Court is not convinced that no other assembly could fit its

description.  Medline's evidence, collectively, may provide strong circumstantial evidence that a Foley catheter is what was anticipated when the patent was drafted.  This Court is not convinced, however, that an individual of ordinary skill in the art, when faced with the general descriptive term "catheter" and the details of the patent specification, would inherently recognize from the language of the patent that a Foley catheter was being referenced.  *Id.*.

Medline also contends that, in construing "catheter assembly," this court should construe the tubing connecting the catheter to the drainage receptacle to be "coiled."  Here, again, the claim language does not provide any explicit support for this proposed interpretation.  The language of the patent specification, however, clearly does.  The background section notes that catheter assemblies are generally shipped in a coiled configuration and it is repeatedly stated that the tray or second compartment of the tray are designed to accommodate a "coiled medical device" such as a catheter or catheter assembly.  This interpretation is further supported by the patent drawings, which depict a hollow tube arranged in a coiled configuration inside the tray.  This specification language makes clear that "catheter assembly," as used in the patent, describes a coiled medical device, and the Court will therefore incorporate that definition into the construction of "catheter assembly."

Bard attempts, through expert testimony, to establish that the tube shown in the patent drawings represents a generic catheter, rather than a drainage tube or a part of a larger catheter assembly.  Issues of scale aside, the tube in question connects directly to the drainage receptacle, which is clearly shown in the patent drawings.  Thus it is clear that, although it might well generically represent the catheter, the tube in question must also consist of whatever drainage tubing is necessary to connect the catheter to the drainage receptacle.[3]  That, after all, is what the parties have agreed constitutes a "catheter assembly," which the specification states is what is being shown in the

---

[3] Karl Leinsing, in his declaration, claims that the specification drawings show a short section of non-coiled drainage tubing connecting the catheter to the drainage receptacle.  That section, however, is indistinguishable from the remainder of the tubing shown, and this Court disagrees with its characterization as being uncoiled.

figures. The contrary expert opinions that Bard relies on omit the drainage tubing from the drawing and specification without explanation, and the Court therefore finds them to be unpersuasive

The Court accordingly concludes, based on the patent specification and patent drawings, that the proper construction of "catheter assembly" is "a medical device that includes a catheter connected via coiled tubing to a drainage receptacle."


IT IS SO ORDERED.

Date: 12/28/2018

Entered: _____
SHARON JOHNSON COLEMAN
United States District Court Judge